**MIDLAND–ROSS CORPORATION,**
Plaintiff,
v.
**UNITED STATES of America,**
Defendant.

**Civ. A. No. 36611.**

United States District Court
N. D. Ohio, E. D.
March 11, 1963.

Theodore M. Garver, Jones, Day, Cockley & Reavis, Cleveland, Ohio, for plaintiff.

Merle M. McCurdy, U. S. Atty., Cleveland, Ohio, for defendant.

KALBFLEISCH, District Judge.

This is a suit to recover income and excess profits taxes for the years 1952, 1953 and 1954. The taxpayer is the Midland-Ross Corporation, successor in interest to the Industrial Rayon Corporation. During the period in question, for the purpose of temporarily investing funds not then currently required for its operation, the taxpayer purchased thirteen notes, the face amounts of which varied from $500,000 to $2,000,000. These notes bore no interest, but rather were purchased at a discount by the taxpayer from the maker. Each of the notes was a time instrument.

Before maturity each note was sold to a financial institution at a price which was in excess of the price which had been paid to the maker but below the face amount.

The price paid by the taxpayer to the maker of each note was calculated by subtracting from the face amount a figure determined by multiplying the face amount by an agreed percentage, dividing the product by 360, and multiplying the result by the number of days from the date of such payment to the maturity of the note. The agreed percentage was determined on the basis of the consideration of several factors, including (1) the prevailing interest rates for notes of such duration made by borrowers with credit standings of the obligor, (2) the availability of such notes to prospective purchasers, and (3) the maker's need for cash funds. All of the notes were capital assets in the hands of the taxpayer and were sold by it in bona fide sales. In negotiating the sale price of the notes, the following factors were considered: (1) the face amounts of the obligations, (2) the credit rating of the obligor, (3) the period of time between the sale and the maturity of the notes, (4) the prevailing interest rates, and (5) the amount of cash funds available to the purchaser.

In this three-year period the taxpayer realized a total appreciation of more than $280,000 on these notes. It contended that this appreciation was a capital gain, while the Internal Revenue Service contended that it was regular income. The taxpayer paid taxes at the regular income rate, and is here seeking a refund.

The relevant sections of the Internal Revenue Code are: Section 117(a) (1) (2) and (4) and Section 111(a) of the 1939 Code, and their counterparts in the Code of 1954.

Section 117(a) (1) of the 1939 Code defines a capital asset as:

"* * * property held by the taxpayer (whether or not connected with his trade or business), but does not include * * *

"(D) an obligation of the United States or of any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue."

Subsections (2) and (4) of Section 117 (a) provide that a capital gain is a gain from the sale of a capital asset, and Section 111(a) provides that the gain from the disposition of property is the "excess of the amount realized therefrom over the adjusted basis * * *."

Plaintiff stresses the fact that the language of the statute, especially of Section 117(a) (1) defining a capital asset, is broad and sweeping. It contends that

because these notes were capital assets the gain realized thereon was a capital gain. It contends, further, that in view of Section 117(a) (1) (D), which specifically excludes certain types of discount paper from the category of capital assets, and in view of the failure to exclude such paper as these notes, the Congress clearly indicated its intention that the gain achieved on the sale of such notes constitutes capital gain under the maxim of *expressio unius est exclusio alterius.*

■ The taxpayer's contention is a familiar enough general rule of statutory construction. However, various courts have read certain exceptions into this statute. They have held that, while it might appear that a literal construction of the statutory language would convert all but the specifically excluded gains into capital gains, the provisions must be construed in the light of their general purpose and the surrounding law. After so doing, these courts have read further exceptions into the statute, which have resulted in the exclusion from capital gains treatment of certain increments which a literal interpretation might indicate were capital gains. See, for example, Jaglom v. Commissioner, 303 F.2d 847 (2nd Cir., 1962); United States v. Harrison, 304 F.2d 835 (5th Cir., 1962). In view of the fact that these statutory sections have not been interpreted to include all of the transactions which the sweeping scope of their language might indicate were within their purview, the Court is constrained to hold that this argument is not dispositive of the case.

The Government contends that the realized increment was in fact interest paid for the use of money, and was therefore regular income to the taxpayer. It contends that this is but another instance for application of the well recognized rule that when a taxpayer combines the sale of a right to receive ordinary income with the sale of a capital asset the ordinary income is not converted into a capital gain by its sale in combination with the capital asset. Fisher v. Commissioner, 209 F.2d 513 (6th Cir., 1954), cert. den. 347 U.S. 1014, 74 S.Ct. 868, 98 L.Ed.

1136; Commissioner v. Morgan, 272 F.2d 936 (9th Cir., 1959); Rosen v. United States, 288 F.2d 658 (3rd Cir., 1961); United States v. Harrison, 304 F.2d 835 (5th Cir., 1962); and United States v. Langston, 308 F.2d 729 (5th Cir., 1962).

The taxpayer does not dispute the general validity of this proposition. Its principal contention, however, is that the rule is inapplicable on these facts because the increment, for purposes of taxation at least, was not interest. It fully admits that if these notes had borne interest at a stated rate, and if it had then sold such notes before maturity at an increase in price, the amount of such increase allocable to the proportion of the interest earned to the date of sale would have been regular income under the rule of Fisher v. Commissioner and the other cases cited, supra. However, it contends that a different result is achieved when, instead of the notes bearing interest at a fixed rate, they were originally sold at a discount. The taxpayer urges that there has been a continuous history of legislative, administrative and judicial interpretation since 1920 which has consistently held that original issue discount in the hands of a cash basis taxpayer is not income, and that the appreciation resulting therefrom is not taxed as regular income but, rather, as a capital gain.

■ If it is true that historically the law has not considered such original issue discount as interest, but has removed it from the broad category of regular income and placed it within the specific classification of capital gain, then the increment in this case was not income and the general rule upon which the Government relies is inapplicable. The Court, therefore, must proceed to examine the treatment which such discount has traditionally received.

Commissioner v. Caulkins, 144 F.2d 482 (6th Cir., 1944) is the primary cornerstone upon which the taxpayer rests its contention that the increment here involved was not, for taxation purposes at least, compensation for the use of its money. In that case the taxpayer had purchased an accumulative installment

certificate under the terms of which he was to make periodic payments to the seller, who, at the end of ten years, would pay to the taxpayer the sum of $20,000. This $20,000 was approximately $4,900 more than the total amount of the payments made to the seller. The Commissioner contended that this $4,900 was compensation for the use of the taxpayer's money, and was thus really interest. He held that this interest was regular income, although the taxpayer contended it was a capital gain.

The certificate involved in the Caulkins case was in registered form and the decision was based upon an interpretation of Section 117(f) of the Internal Revenue Code of 1939. Section 117(f) provided that amounts received by the holder of registered securities upon their retirement should be considered as amounts received in exchange therefor. The Court held that although the $4,900, at least in many respects, was similar to interest, it was an amount which was received in exchange for the sale of a capital asset and was therefore a capital gain.

To understand the Caulkins decision it is necessary to understand the history of Section 117(f). Before the enactment of that section it had been held that retirement of a bond was not such a sale or exchange as would qualify the amount received upon the retirement for capital gains treatment. See Fairbanks v. United States, 306 U.S. 436, 59 S.Ct. 607, 83 L.Ed. 855 (1939). Section 117(f) was enacted to avoid this holding. It provided that amounts received upon the retirement of certain evidences of indebtedness which had interest coupons attached, or which were in registered form, should be considered as amounts received in exchange therefor. This provision enabled the amounts received upon the retirement of such bonds to qualify as capital gains. The taxpayer contends that this provision was enacted to accord the same tax treatment to such bonds upon their retirement as always had been accorded them on a sale before retirement. And, according to Mertens

Law of Federal Income Tax, Volume 38, page 368, M 82:

"The purpose underlying the enactment of Section 117(f) of the 1939 Code was to accord to the retirement of obligations similar treatment as was then, and is now, accorded to to their sale or exchange."

In view of the purpose of Section 117(f), it appears that before the passage of that section amounts received upon the sale of such evidences of indebtedness did qualify for capital gains treatment. If a sale before maturity of such obligations did not permit increments to be accorded capital gains treatment, it is unlikely that the Congress would have deliberately enacted a provision according them such favorable treatment upon retirement.

From the combination of this legislative history with the Caulkins decision it is possible to draw the following analogy: Section 117(f), under the Caulkins holding, provided that all amounts received in exchange for the retirement of a qualifying capital asset were capital gains. Because Section 117(f) was meant to be declaratory of the pre-existing law on sales before retirement, it follows that all amounts received on the pre-retirement sale of such debt obligations were likewise capital gains. The validity of this analogy must be tested by a further inquiry into legislative, administrative and judicial history. However, before proceeding with that history it is necessary to examine the Government's position as to what the Caulkins case really held.

The Government contends that Caulkins was based solely upon an interpretation of Section 117(f). It says that the crucial fact in Caulkins was not that the debt obligations were discount obligations but that a retirement rather than a sale was involved. It has thus attempted to convince the Court that the Caulkins decision does not control this case, because in the present instance the notes were sold before maturity, rather than retired. It is true that the opinion in the Caulkins case primarily discusses

the retirement factor; however, the Court is not convinced that increments on debt obligations which qualify under Section 117(f) would be accorded capital gains treatment if the obligations were retired, but would be taxed at regular income rates if they were sold before maturity. Even the Tax Court, which adopted that position in Paine v. Commissioner, 23 T.C. 391 (1954), Rev. 236 F.2d 398 (8th Cir., 1956), and Stanton v. Commissioner, 34 T.C. 1 (1960), has now abandoned such a distinction. Gibbons v. Commissioner, 37 T.C. No. 57. The purpose of Section 117(f) surely was not to accord a more favorable tax treatment to income realized upon retirement of debt obligations than it would receive if they were sold before maturity. The quotation from Mertens, supra, also clearly indicates that such was not the case. Therefore, this Court is constrained to hold that the crucial fact in the Caulkins case was that the evidences of indebtedness were discount obligations.

The combination of the Caulkins case with Section 117(f) thus indicates that appreciation realized on evidences of indebtedness, issued at an original discount and sold before maturity, constituted a capital gain and not regular income. The remaining question, therefore, is whether the legislative, administrative and judicial treatments of discount obligations support this indication.

The earliest administrative decision upon this matter which has been furnished to the Court is Office Decision 1024 published in Vol. 2, Cum.Bul. 189 (1920), holding that original issue discount on bonds was not interest and, therefore, was not subject to special withholding provisions when the bonds were in the hands of foreign corporations. It is true, as the Government contends, that this opinion was not concerned with whether an appreciation resulting from such discount was a capital gain or regular income. It was concerned, however, with whether such gain was in fact interest. The opinion carefully examined the various factors involved and came to the conclusion that original issue discount, while in some ways like interest, differed from interest in other respects and was in fact not interest.

The writers appear to have been agreed that in the period following 1920 a taxpayer could not accrue bond discount, but had to report all of it in the year in which it was received. No part of the discount was allowed to be treated as income prorated over the life of the bond. See Accountant's Handbook, 2d Ed., p. 339 (1932); Newlowe, Intermediate Accounting, p. 205 (1939); and 4 Mertens Law of Federal Income Taxation, Section 23.162, p. 298. However, this well established rule does not meet the real issue in question, which is whether the income, in the year in which it was reported, was treated as a capital gain or as regular income. There is, however, one case from this period which again reiterates the fact that discount is not interest. That case is Corn Exchange Bank v. Commissioner, U. S. Board of Tax Appeals, 6 B.T.A. 158 (1927). Taxpayer had sought to amortize bond discount and premium. The Board of Tax Appeals refused to allow such amortization. In doing so, it said, at page 161:

"The discount on the bond purchased below par is unlike interest, which is a fixed charge and accrues periodically. The right to receive this discount, or difference between the cost of the bond and its par, cannot be determined in advance as the bond may be sold for more or less than its cost, or, perhaps, as in the case of many bonds, it may be redeemed prior to its maturity at an amount different from its principal or face amount of the bond. This discount is not earned or accrued in annual installments and cannot be income to the holder of the bond, either as additional interest or as a separate item of income."

The Government contends that the Corn Exchange Bank opinion was dealing only with regular discount as distinguished from original issue discount. It fully agrees that discount which is the result

of such factors as an obligor's default in interest payments does not give rise to ordinary income. However, an examination of both the facts and the opinion in the Corn Exchange Bank case fails to reveal that the Court there was discussing any particular kind of discount. A practical examination of the transactions involved leads the Court to conclude that it is extremely likely that both kinds of discount were involved.

This case indicates that during the 1920's the Department of Internal Revenue, which prevailed in the Corn Exchange Bank decision, had contended that discount was not interest. And if discount was not interest, income resulting from discount could not have been taxable at regular rates on the premise that it was interest.

In 1940 the Internal Revenue Service held that income realized from the redemption of state discount bonds was interest, and, accordingly, was non-taxable. G.C.M. 21890, 1940–1, Cum.Bul. 85. It said the courts had considered the nature of discount and found it to be like deferred interest. Such discount was, in effect, payment for the use of the money lent. The value of this ruling is questionable, however, because it necessarily involved statutory and constitutional limitations upon the federal taxation of state bonds. And while the ruling held that such discount was like interest, it carefully avoided holding that it was interest. Thus, at least until 1940, and possibly thereafter, the Internal Revenue Service held that discount was not interest. The legislative treatment of bond discount should be viewed against this administrative background.

In 1929 the Congress authorized the Treasury Department to issue non-interest-bearing discount obligations. The bill authorizing these notes, as passed by the House and as approved by the Senate Finance Committee, contained a provision that, as to profits attributable to the discount, "any gain from the sale or other disposition thereof shall be exempt from all taxation." Congressional Record, Senate, June 4, 1929, p. 2319. This provision for tax exemption met with considerable opposition upon the floor of the Senate, *because the Senators believed such profits were capital gains,* and feared that such a provision would open the way for the future exemption of all capital gains from taxation. Several members of the Senate engaged in a lengthy debate about the relationship between original issue discount and interest, and the tax consequences that flowed therefrom. That debate indicates that at least some members of the Senate believed that original issue discount was in fact a substitute for interest; but those who purported to be familiar with the subject pointed out that, under the then current practice of the Bureau of Internal Revenue, income attributable to original issue discount was treated as a capital gain and not as regular income. See page 2331, Congressional Record, supra. The question was finally resolved by the insertion of a provision in the bill that amounts received as the result of original issue discount on these notes would be called interest, thus bringing them within the already existing interest exemption. Likewise, a similar provision was added as an amendment to the Second Liberty Bond Act of 1917, Title 31 U.S.C.A. § 757c(d). Thus, the legislative history indicates that appreciation resulting from this discount was statutorily transformed into interest to avoid its taxation as a capital gain.

These facts further substantiate the taxpayer's contention that during the period of the 1920's and early 1930's original issue discount was not considered interest, but rather gave rise to a capital gain. Furthermore, the Congress was aware of this construction and acquiesced therein by failing to statutorily change the rule until 1954. See Section 1232 (a) (2) (A), Internal Revenue Code of 1954. This section now provides that, upon the sale or exchange of evidences of indebtedness issued by a corporation or a government, amounts of appreciation attributable to original issue dis-

count will not be considered as gains resulting from the sale or exchange of a capital asset. In other words, in 1954, and governing evidences of indebtedness issued after the ones which are now before this Court, the Congress stated that appreciation resulting from original issue discount would henceforth be considered as regular income and not as capital gain.

The House report accompanying this section stated that under existing law such gains were taxed as capital gains if the bond was held to retirement, and that this section was enacted to change that rule insofar as appreciation resulting from original issue discount was concerned. 3 U. S. Code Congressional and Administrative News, 1954, p. 4110. The report of the Senate Finance Committee is less helpful. It merely stated that "There is some uncertainty as to the status of proceeds in these transactions, i. e., as capital gain or as interest income where the bond or other evidence of indebtedness has been issued at a discount * * *." 3 U. S. Code Congressional and Administrative News, 1954, p. 4745. In support of its statement that there was some confusion as to the current status of the law, the Senate report compared Commissioner v. Caulkins to I.T. 3486, 1941–2 Cum.Bul., p. 76. However, the Internal Revenue holding, upon which the Senate Committee relied, dealt only with a specific statutory provision which provided that such gains realized on the sale of Treasury bills should be interest. That provision had been enacted to make such gains non-taxable by bringing them within the exemption which interest enjoyed. Thus, the Senate Report does not cite any evidence of uncertainty insofar as the generally applicable principles are concerned.

At various times the Congress has enacted special provisions regarding the treatment of discount. For instance, the Internal Revenue Code of 1939, Sections 201(e) and 207(e), provided that stock and mutual life insurance companies must accrue discount.

And in 1938 the House Ways and Means Committee discussed the relationship between discount and interest. That Committee report stated:

"It is important also to emphasize that there is no clear separation, in practice, between capital gains and ordinary income; * * * *A bond purchased at a premium results in a capital loss when redeemed at par, and a bond purchased at a discount, in a capital gain."* Hearings on H.R. 9682, Subcommittee of Committee on Ways and Means, 75th Congress, Third Session, p. 38. (Emphasis added.)

Here again is evidence of Congressional knowledge that appreciation due to bond discount was a capital gain. The Subcommittee recommended that no change be made in this rule.

And again, in Section 42(b) of the 1939 Internal Revenue Code, the Congress gave taxpayers an election to treat as current income the periodic increases in redemption value of non-interest-bearing obligations issued at a discount when such obligations were redeemable for fixed amounts which increased at stated intervals.

Thus the evidence indicates that the Congress clearly believed that appreciation resulting from original issue discount was a capital gain. With this knowledge Congress adopted various pieces of specific legislation providing for special treatment of discount in certain specified situations. However, Congress took no action to change the general law. These facts indicate a Congressional intention, until 1954, that capital gains treatment continue to be accorded to gains resulting from bond discount. And there was no indication of any thought that different treatment should be given to gains resulting from original issue discount than was accorded those resulting from other types of discount.

Both parties have cited various explanations and public policies underlying the special treatment which the Congress has accorded to capital gains. As the Government has indicated, there are several reasons for this special treatment.

However, even the Government cannot deny that one important reason is to avoid taxing, at unusually high rates, income which has in fact been earned over a number of years but which is realized only in the year of sale. In other words, the accumulation of income actually accrued over a period of years, but realized only in the year of sale, which is inherent in the profitable sale of most capital assets, would, under our system of highly progressive income taxation, result in a taxation of such income at far higher rates than would have been the case if the income had been reportable in each of the years in which it accrued but was not realized. The capital gains provisions place a limit upon the extent to which such gains can be taxed. In view of this purpose, it certainly appears that the long-term appreciation, resulting from original issue discount of bonds and other evidences of indebtedness, can be appropriately fitted within that category of appreciation which is accorded the special capital gains treatment.

In several instances the Tax Court has had occasion to consider the proper method of taxing gains resulting from original issue discount. It must be remembered that in the Corn Exchange Bank case, supra, the Board of Tax Appeals held that discount was not interest. The next occasion on which the Court was faced with the problem was in Caulkins v. Commissioner, 1 T.C. 656 (1943), where it decided that original issue discount gave rise to a capital gain and not to regular income. It was this opinion which was affirmed by the Sixth Circuit in Commissioner v. Caulkins, supra.

In 1954, on a complex factual situation, it held that discount was really interest and therefore gave rise to regular income when the securities were sold before maturity. Paine v. Commissioner, 23 T.C. 391 (1954). That holding was reversed by the Eighth Circuit in Paine v. Commissioner, 236 F.2d 398 (1956). While it cannot be said that the Eighth Circuit held that discount resulted in a capital gain, that Court did hold that the appreciation involved in the Paine case was not interest. The language of the Court further indicates, however, that it did not think that discount created gains which were taxable as regular income.

Another case before the Court was Commissioner v. Morgan, 30 T.C. 881 (1958), involving accumulative investment certificates identical to those in the Caulkins case. The Tax Court held that the appreciation on these certificates was a capital gain. The Commissioner appealed that determination to the Ninth Circuit, which reversed the Tax Court. Commissioner v. Morgan, 272 F.2d 936 (1959). The Court of Appeals considered the Sixth Circuit's Caulkins decision and refused to follow it. The Court held that Section 117(f) was designed only to allow capital gains treatment to be accorded to "true" capital gains. The Court refused to give the language of Section 117(f) the all-encompassing scope that it had been acccorded by the Sixth Circuit.

The Tax Court reaffirmed its holding that such gains were capital gains in Goodstein v. Commissioner, 30 T.C. 1178 (1958). And it was again faced with another of the Caulkins-type accumulative investment certificates in Kormendy v. Commissioner, 18 T.C.M. 353 (1959). This case was decided after Morgan but before the reversal of Morgan by the Ninth Circuit. Again, the Tax Court affirmed its Morgan and Caulkins holdings.

Finally, in 1960, after the reversal of the Morgan decision by the Court of Appeals, the Tax Court again had a similar problem in Stanton v. Commissioner, 34 T.C. 1 (1960). In that case the taxpayer had purchased short-term Government notes and commercial paper at a discount. This paper he sold before maturity but after holding for more than six months. The excess of the amount realized over the cost was reported as a long-term capital gain. The Tax Court held that the appreciation was regular income because the notes were sold before maturity. In support of this

decision the Court cited its Paine opinion, which it said had been reversed on other grounds.

The most recent case that it has considered was Gibbons v. Commissioner, 37 T.C. No. 57. In Gibbons the Tax Court held that discount was *always* interest, and thus regular income, no matter whether it was realized upon a sale or exchange before retirement, or upon the retirement of a debt obligation. Thus, in Gibbons, the Tax Court completely rejected the Caulkins decision, and abandoned the distinction that it had made in Paine and Stanton between gains realized on a sale and gains realized on a retirement.

The problem of original issue discount has been considered recently by a number of constitutional courts. Most of the decisions which were cited to this Court have but again reaffirmed the validity of the general principle for which the Government contends. When the evidences of indebtedness in question were interest-bearing obligations the applicability of this proposition cannot be questioned. Cases which have dealt with the rule in such situations are: Fisher v. Commissioner, 209 F.2d 513 (6th Cir., 1954), cert. den. 347 U.S. 1014, 74 S.Ct. 868, 98 L.Ed. 1136; United States v. Langston, 308 F.2d 729 (5th Cir., 1962); Arnfeld v. United States, 163 F.Supp. 865, 143 Ct.Cl. 277 (1958), cert. den. 359 U.S. 943, 79 S.Ct. 722, 3 L.Ed.2d 676; and Jaglom v. Commissioner, 303 F.2d 847 (2nd Cir., 1962); cf. Commissioner v. Phillips, 275 F.2d 33 (4th Cir., 1960). Thus, there are only five cases which actually have dealt with the treatment to be accorded to gains resulting from original issue discount. Those cases are: Commissioner v. Caulkins, 144 F.2d 482 (6th Cir., 1944); Commissioner v. Morgan, 272 F.2d 936 (9th Cir., 1959); Rosen v. United States, 288 F.2d 658 (3rd Cir., 1961); United States v. Harrison, 304 F.2d 835 (5th Cir., 1962); and Pattiz v. United States, Ct.Cl., 311 F.2d 947 (1963). The Morgan and Rosen decisions were based upon the same fact situation that was presented to the Sixth Circuit in Caulkins. The results in the Third and Ninth Circuits were obtained by a specific rejection of the Caulkins decision. In neither case did the Court examine the legislative, administrative or judicial history which has surrounded the treatment of original issue discount. Instead, the Court was presented with the proposition on an almost *de novo* basis and, perhaps naturally enough in the absence of familiarity with the detailed history, fell back upon the broad, general proposition for which the Government here contends. Likewise, the Harrison and Pattiz decisions were based upon a specific rejection of Caulkins and on an adoption of the Morgan and Rosen opinions, and neither case considered the historical treatment of original issue discount. Therefore, while it is true that the recent cases have adopted the Government's position, they have done so (1) without a discussion of the historical treatment of gains resulting from original issue discount, and (2) only upon a rejection of the Caulkins case, which is controlling in this Circuit.

The following factors support the taxpayer's contention: (1) the opinions of the Department of Internal Revenue and the Board of Tax Appeals, during the 1920's and early 1930's that discount was not interest; (2) Congressional belief, expressed both in 1929 upon authorization of Treasury bills and later in the Second Liberty Bond Act, that original issue discount resulted in a capital gain, and consequent Congressional action to avoid that result; (3) the report of the Subcommittee of the Ways and Means Committee of the House of Representatives, in 1938, that discount gave rise to a capital gain; (4) Congressional enactment of various specific pieces of legislation providing that appreciation resulting from discount would be treated as other than a capital gain; (5) the failure of the Congress to take any action to change the treatment of bond discount except in regard to highly specialized factual situations; (6) the passage of Section 117(f), as interpreted by the Caulkins decision, indicating that all

amounts received upon retirement, and attributable to original issue discount, were capital gains; (7) the numerous early opinions of the Tax Court that original issue discount resulted in a capital gain; and (8) the fact that none of the cases which have rejected Caulkins have considered the historical treatment of bond discount. Against these factors, and in support of the Government's contention, it is possible to infer, from several administrative rulings dealing with specific statutory situations, that bond discount was really interest and was taxable as regular income. The 1929 Senate debate and the 1938 House hearings refute any possible implication from other Congressional enactments that original issue discount resulted in regular income. The factors supporting the taxpayer's contention are clearly of controlling weight.

It may well be that, in financial circles at least, original issue discount is considered to be a form of interest. If this is the case, it is certainly understandable why the various courts of appeal, which have considered this question on an almost *de novo* basis, have held that original issue discount resulted in regular income to the taxpayer. It is likewise true that there has been a trend—commencing with certain legislative enactments, proceeding through some administrative interpretations, and culminating with the Congressional enactment of 1954—toward classifying appreciation resulting from original issue discount as interest. This trend began with certain very specific factual situations and expanded to include nearly all governmental and corporate evidences of indebtedness. However, careful study of this developing trend confirms the Court's belief that it has effectuated a change in the law. The facts in this case are not within any of the specific factual situations for which this change has been made and, therefore, the Court is constrained to hold that, as to the notes here in question, the appreciation for taxation purposes was not interest but,

rather, an appreciation on capital, and was therefore taxable as a capital gain.

Should it be required, this memorandum will be adopted as findings of fact and conclusions of law under Section 52(a), Federal Rules of Civil Procedure.