THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 45430-85.          Filed January 11, 1988.

*Michael F. Kelleher,* for the petitioner.
*Ellen Pilsecker,* for the respondent.

OPINION

STERRETT, *Chief Judge:* By notice of deficiency dated September 26, 1985, respondent determined deficiencies of $6,954,469 and $6,910,113 in petitioner's Federal income taxes for calendar years 1972 and 1973, respectively. After concessions, the only issue for decision is whether petitioner, in computing its gross investment income under section 804(b),[1] must include certain prepayment penalties attributable to its post-1954 corporate mortgage loans as income described under section 804(b)(1)(C).[2]

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]The sections discussed herein, sec. 804(b) and, *infra,* sec. 1232, were repealed for years ending Dec. 31, 1983, and July 18, 1984, respectively. Secs. 211(a)(1) and 42(a)(1), Deficit Reduction Act of 1984, 98 Stat. 720, 556.

The parties submitted this case on fully stipulated facts pursuant to Rule 122. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioner, the Prudential Insurance Co. of America, is a mutual life insurance company incorporated under the laws of the State of New Jersey. Petitioner had its principal office in Newark, New Jersey, when it filed its petition in this case, and timely filed its Federal income tax returns for the years at issue with the District Director in Newark, New Jersey.

As part of its investment activities, petitioner issued loans secured by mortgages on real property (mortgage loans) to corporate and noncorporate mortgagors. After issuance, petitioner retained these mortgage loans until retirement, rather than selling them to other financial institutions. Petitioner, however, generally permitted the mortgagors to prepay the mortgage loans and typically charged fees, known as "prepayment penalties," for any prepayments that exceeded specific percentage limitations.[3]

In its 1972 and 1973 Federal income tax returns, petitioner reported total prepayment penalties of $3,707,900 and $2,686,664, respectively. Petitioner treated the portion of the prepayment penalties that it derived from mortgage loans issued to corporations after December 31, 1954 (post-1954 corporate mortgage loans), as long-term capital gain under section 1232 and, in computing its gross investment income under section 804(b), excluded that portion from income described under section 804(b)(1)(C), in the amounts of $1,558,670 and $651,251 for 1972 and 1973, respectively.[4]

In his notice of deficiency, respondent determined that in computing petitioner's gross investment income under section 804(b), the prepayment penalties attributable to petitioner's post-1954 corporate mortgage loans were includable as income described under section 804(b)(1)(C). Correspond-

---

[3]Petitioner typicallly used provisions in the mortgage loans to specify the terms of the prepayment penalties and charged the prepayment penalties in addition to any unpaid interest accrued to the date of prepayment.

[4]Correspondingly, petitioner computed its income described under sec. 804(b)(1)(C), as $2,149,230 and $2,035,413 for 1972 and 1973, respectively, representing prepayment penalties attributable to noncorporate mortgage loans and to corporate mortgage loans issued before Jan. 1, 1955.

ingly, respondent reduced petitioner's long-term capital gain and increased petitioner's income described under section 804(b)(1)(C) by $1,533,339 and $647,175 for 1972 and 1973, respectively.[5]

We must decide whether petitioner, in computing its gross investment income under section 804(b), must include the prepayment penalties at issue as income described under section 804(b)(1)(C). In general, life insurance companies[6] are subject to tax based in part upon the computation of "gross investment income," a term defined under section 804(b) to include interest and other mortgage-related income.[7] See secs. 802, 804. Specifically, prepayment penalties on mortgage loans are includable in computing "gross investment income" as income described under section 804(b)(1)(C).[8] Indeed, under established case law, prepayment penalties on mortgage loans are includable in computing gross investment income because they constitute interest substitutes or additional fees for the use or forebearance of money. *United Benefit Life Insurance Co. v. McCrory*, 242 F. Supp. 845 (D. Neb. 1965), affd. 414 F.2d 928 (8th Cir. 1969); *Equitable Life Assurance Society of the United States v. United States*, 149 Ct. Cl. 316, 181 F. Supp. 241 (1960); see also *General American Life Insurance Co. v. Commissioner*, 25 T.C. 1265 (1956).

Apparently, petitioner does not contest respondent's determination that, in computing gross investment income, the provisions of section 804(b)(1)(C) apply, literally, to the

---

[5]These amounts represent the prepayment penalties that respondent determined as attributable to petitioner's post-1954 corporate mortgage loans. The parties stipulated, however, that the prepayment penalties at issue are $1,532,053, and not $1,533,339, for 1972.

[6]The parties stipulated that petitioner qualified as a "life insurance company" under sec. 801(a) during the years at issue.

[7]Sec. 804(b) provides in pertinent part as follows:

SEC. 804(b). GROSS INVESTMENT INCOME.—For purposes of this part, the term "gross investment income" means the sum of the following:

(1) INTEREST, ETC.—The gross amount of income from—

    (A) interest, dividends, rents, and royalties,

    (B) the entering into of any lease, mortgage, or other instrument or agreement from which the life insurance company derives interest, rents, or royalties, and,

    (C) the alteration or termination of any instrument or agreement described in subparagraph (B).

[8]For example, the regulations specifically provide that "gross investment income includes amounts received as * * * a penalty for the early payment of a mortgage," language similar to that found in the legislative history to the Life Insurance Company Tax Act for 1955. Sec. 1.804-3(a)(1), Income Tax Regs.; see H. Rept. 1098, 84th Cong., 1st Sess. (1955), 1956-1 C.B. 954, 957; S. Rept. 1571, 84th Cong., 2d Sess. (1956), 1956-1 C.B. 967, 970.

prepayment penalties at issue. Instead, petitioner argues that, notwithstanding section 804(b)(1)(C), the prepayment penalties at issue qualify for long-term capital gain treatment under section 1232 because they represent gain on the retirement of corporate obligations issued after December 31, 1954.[9] Petitioner asserts, therefore, that the prepayment penalties at issue are excludable from income described under section 804(b)(1)(C) by operation of the last sentence of section 804(b), which provides:

Except as provided in paragraph (2) [relating to the computation of the excess, if any, of net short-term capital gain over net long-term capital loss], incomputing gross investment income under this subsection, there shall be excluded any gain from the sale or exchange of a capital asset, and any gain considered as gain from the sale or exchange of a capital asset.

Respondent, on the other hand, argues that the prepayment penalties at issue do not qualify for long-term capital gain treatment under section 1232, but instead are includable as income described under section 804(b)(1)(C) in computing petitioner's gross investment income. Although petitioner presents meritorious arguments, we agree with respondent for the following reasons.

Upon the retirement of its mortgage loans, petitioner is not entitled to long-term capital gain treatment under section 1232 for amounts that represent ordinary income. *United States v. Midland-Ross Corp.,* 381 U.S. 54, 56-57 (1965), and cases cited therein; see generally *Williams v. McGowan,* 152 F.2d 570 (2d Cir. 1945). As discussed above, prepayment penalties on mortgage loans in general constitute interest substitutes or additional mortgage loan fees and, therefore, constitute ordinary income. *General American Life Insurance Co. v. Commissioner,* supra at 1267; *United Benefit Life Insurance Co. v. McCrory,* 242 F. Supp. at 851; see generally *Hort v. Commissioner,* 313 U.S. 28 (1941). In the present case, the record contains no evidence indicating that the prepayment penalties at issue differ in

---

[9]In general, gain on the sale, exchange, or retirement of corporate debt obligations issued after Dec. 31, 1954, qualifies as long-term capital gain under sec. 1232 except to the extent of earned original issue discount. Sec. 1232(a)(1) and (a)(2). With respect to petitioner's argument, the parties stipulated that petitioner did not issue its post-1954 corporate mortgage loans at a discount. Specific portions of sec. 1232 relevant to petitioner's argument are set forth in the Appendix at page 43.

kind from those in the foregoing cases. A penalty is a penalty is a penalty. Accordingly, we must conclude that the prepayment penalties at issue constitute ordinary income and therefore do not qualify for long-term capital gain treatment under section 1232.

Petitioner asserts, however, that in general, prepayment penalties do not constitute ordinary income as interest substitutes, but instead constitute long-term capital gain because they provide compensation for lost capital appreciation in relation to mortgage loans without prepayment provisions.[10] However, the record contains no evidence indicating that petitioner realized any capital appreciation on its post-1954 corporate mortgage loans, or indicating that petitioner inserted the prepayment provisions in its mortgage loans in order to receive compensation for lost capital appreciation.[11] We can only conclude on the record before us, adversely to petitioner's assertion but consistently with the discussion above, that the prepayment penalties at issue simply constituted interest substitutes or additional mortgage loan fees to petitioner.

Petitioner further argues that several of the foregoing decisions are not controlling in the present case because they address provisions of the 1939 Code, rather than long-term capital gain considerations under section 1232 and the last sentence of section 804(b). See *General American Life Insurance Co. v. Commissioner, supra;* see also *Prudential Insurance Co. of America v. United States,* 162 Ct. Cl. 55, 319 F.2d 161 (1963). However, each of the foregoing decisions consistently holds that, with respect to the substance of the payments involved, prepayment penalties attributable to mortgage loans represent interest substitutes or additional mortgage loan fees and, consequently, constitute ordinary income. Compare, e.g., *Equitable Life Assurance Society of the United States v. United States,* 181 F. Supp. at 242-244, with *Prudential Insurance Co. of America v. United States,* 319 F.2d at 166-167. As dis-

---

[10]With respect to this assertion, the parties stipulated to hypothetical market conditions in which the values of mortgage loans with no prepayment provisions typically increase when prevailing market interest rates decrease below the stated interest rates of those mortgage loans.

[11]To the contrary, the record indicates that petitioner held its mortgage loans to retirement, did not sell its mortgage loans to third parties, and inserted prepayment provisions in its mortgage loans to discourage prepayments during periods of falling interest rates.

cussed above, the record simply contains no evidence to support characterizations of the prepayment penalties at issue that differ from the characterization consistently found in each of these decisions.

Petitioner asserts, however, that the legislative history of section 1232(a)(2) provides support for treating the prepayment penalties at issue as long-term capital gain. The legislative history cited by petitioner in support of this assertion, however, merely indicates that Congress, by enacting section 1232(a)(2), intended to distinguish between amounts representing earned original issue discount, which constitute ordinary income, and amounts representing capital increments from the sale or exchange of certain corporate debt obligations, which qualify for long-term capital gain treatment.[12] H. Rept. 1337, 83d Cong., 2d Sess. A276 (1954); S. Rept. 1622, 83d Cong., 2d Sess. 434 (1954). The record indicates that petitioner's post-1954 corporate mortgage loans contained no element of original issue discount, and we find nothing in the legislative history cited by petitioner that indicates that Congress intended to treat prepayment penalties on post-1954 corporate mortgage loans as amounts qualifying for long-term capital gain treatment under section 1232. Consequently, we cannot accept petitioner's argument.

Petitioner further asserts that the prepayment penalties at issue qualify as long-term capital gain under section 1232 because they are equivalent, economically, to call premiums on bonds.[13] In support of this assertion, petitioner argues that the legislative history of section 1232 indicates an intent by Congress to treat call premiums on bonds as long-term capital gain under section 1232. However, we find nothing in that legislative history specifically mandating long-term capital gain treatment under section 1232 for prepayment penalties attributable to post-1954 corporate

---

[12]Specifically, the legislative history indicates that Congress, intending results that differ from *Commissioner v. Caulkins,* 144 F.2d 482 (6th Cir. 1944), enacted sec. 1232(a)(2) to limit long-term capital gain treatment to capital, rather than ordinary increments realized upon debt retirements. See *General Foods Corp. v. United States,* 208 Ct. Cl. 606, 613, 530 F.2d 923, 926-927 (1976).

[13]With respect to this assertion, the parties stipulated that call premiums on bonds represent charges exceeding principal and accrued interest and are imposed for the right to retire a corporate bond or debenture prior to maturity, and therefore are equivalent economically to prepayment penalties on mortgage loans.

mortgages.[14] See, e.g., H. Rept. 775, 85th Cong., 1st Sess. (1957), 1958-3 C.B. 811, 840; S. Rept. 1983, 85th Cong., 2d Sess. (1958), 1958-3 C.B. 922, 996-997. In the absence of such a mandate, prepayment penalties may qualify for long-term capital gain treatment only if they constitute long-term capital gain. See, e.g., *United States v. Midland-Ross Corp., supra* at 58-63. As discussed above, the prepayment penalties at issue constitute ordinary income and therefore do not qualify for long-term capital gain treatment.

Finally, petitioner contends that, under the provisions of the last sentence of section 804(b) and certain applicable regulations,[15] determinations regarding long-term capital gain treatment must be the same for life insurance companies as for other taxpayers. Petitioner's contention apparently addresses respondent's assertion that the specific provisions of section 804(b), applicable only to life insurance companies, control over the general language of section 1232. However, having addressed petitioner's arguments herein by applying principles specifically relating to section 1232, we need not address petitioner's contention.[16]

Accordingly, we hold that in computing its gross investment income under section 804(b), petitioner must include the prepayment penalties at issue as income described under section 804(b)(1)(C) in each of the years at issue.

*Decision will be entered under Rule 155.[17]*

---

[14]In connection with petitioner's argument, we note that in *12701 Shaker Boulevard Co. v. Commissioner,* 36 T.C. 255, 257 (1961), affd. 312 F.2d 749 (6th Cir. 1963), we stated that premiums and penalties, both paid for the early retirement of mortgage loans, are indistinguishable. However, we express no view herein with respect to the treatment of call premiums on bonds, and note that *12701 Shaker,* which involved deductions taken by the taxpayer under purported authority of 1939 Code provisions, is distinguishable from and not controlling in the present case.

[15]Specifically, petitioner cites regulations providing, in pertinent part, that "the general rules of the Code relating to gains and losses (such as the rules for determining the amount, characterization and treatment thereof) shall apply with respect to life insurance companies." Sec. 1.802-3(f)(2), Income Tax Regs.; see also sec. 1.817-2(a), Income Tax Regs.

[16]We note that respondents' assertion would have merit to the extent that the general provisions of sec. 1232 are inconsistent with the purposes of the specific provisions of sec. 804(b)(1)(C). See *UngermanTrust v. Commissioner,* 89 T.C. 1131 (1987). Considering the last sentence of sec. 804(b), however, we have attempted herein to view both sec. 1232 and sec. 804(b)(1)(C) as effective and capable of coexistence . See *Morton v. Mancari,* 417 U.S. 535, 551 (1974). Accordingly, we find only that sec. 1232 does not apply to the prepayment penalties at issue and do not address whether respondent's assertion is dispositive of petitioner's contentions.

[17]In his notice of deficiency, respondent stated differing amounts of $1,588,670 and $1,558,670 as the prepayment penalties in dispute for 1972. The apparent discrepancy may be resolved upon computations under Rule 155.

APPENDIX

## SEC. 1232. BONDS AND OTHER EVIDENCES Of INDEBTEDNESS.

(a) GENERAL RULE.—For purposes of this subtitle, in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, * * *

(1) RETIREMENT.—Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (except that in the case of bonds or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued with interest coupons or in registered form, or to those in such form on March 1, 1954).

(2) SALE OR EXCHANGE.—

(A) CORPORATE BONDS ISSUED AFTER MAY 27, 1969.— * * * on the sale or exchange of bonds or other evidences of indebtedness issued by a corporation after May 27, 1969, held by the taxpayer more than 6 months, any gain realized shall * * * be considered gain from the sale or exchange of a capital asset held for more than 6 months. * * *

(B) CORPORATE BONDS ISSUED ON OR BEFORE MAY 27, 1969, AND GOVERNMENT BONDS.— * * * on the sale or exchange of bonds or other evidences of indebtedness issued by * * * a corporation after December 31, 1954, and on or before May 27, 1969, held by the taxpayer more than 6 months, any gain realized which does not exceed [original issue discount]—

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

shall be considered as gain from the sale or exchange of property which is not a capital asset. Gain in excess of such amount shall be considered gain from the sale or exchange of a capital asset held more than 6 months.

(3) INCLUSION IN INCOME OF ORIGINAL ISSUE DISCOUNT ON CORPORATE BONDS ISSUED AFTER MAY 27, 1969.—

(A) GENERAL RULE.—There shall be included in the gross income of the holder of any bond or other evidence of indebtedness issued by acorporation after May 27, 1969, the ratable monthly portion of original issue discount.